1   John H. Gomez (SBN 171485)
    John P. Fiske (SBN 249256)
2   Deborah S. Dixon (SBN 248965)
    Stephanie S. Poli (SBN 286239)
3   **GOMEZ TRIAL ATTORNEYS**
    655 W. Broadway, Suite 1700
4   San Diego, CA, 92101
    619-237-3490/Fax:  619-237-3496
5
    Attorneys for Plaintiffs
6

7

8

9

10              **UNITED STATES DISTRICT COURT**

11              **SOUTHERN DISTRICT OF CALIFORNIA**

12                                      ) Case No.:  3:14-cv-00615-BAS-RBB
                                        )
13   MARIE ANDERSON and ROBERT          ) **FIRST AMENDED COMPLAINT**
     ANDERSON,                          ) **FOR:**
14                                      )
                      Plaintiffs,       )    **(1) NEGLIGENCE;**
15                                      )
     vs.                                )    **(2) FRAUD; AND**
16                                      )
     MEDTRONIC, INC., MEDTRONIC         )    **(3) LOSS OF CONSORTIUM**
17   USA, INC., MEDTRONIC SOFAMOR       )
     DANEK USA, UNC. and DOES 1-100     )
18                    Defendants.       ) Judge:   Hon. Cynthia Bashant
                                        ) Complaint Filed: February 5, 2015
19                                      )
                                        )
20   _____)

21

22        Plaintiffs, by and through the undersigned counsel, hereby bring this Complaint

23   for damages against the Defendants, and alleges the following:

24                              **INTRODUCTION**

25        1.     This is a products liability action arising out of Defendants' failure to

26   comply with the Food and Drug Administration's regulations and such failure and

27   concealment caused the medical profession to be uninformed of the dangers and adverse

28   events and side effects of using Defendant's medical device.  Plaintiff, Marie Anderson,

underwent spinal fusion surgery in which her surgeon used INFUSE Bone Graft manufactured by defendant Medtronic, Inc.  In Ms. Anderson's surgery, the surgeon used the INFUSE Bone Graft in an off-label manner.  The surgeries failed to remedy Ms. Anderson's condition and her pain has only been exacerbated.  In July of 2011, the prominent medical journal, *The Spine Journal*, dedicated its entire journal to publishing numerous articles regarding the risks associated with INFUSE Bone Graft.  The journal articles discuss Medtronic's failure to accurately report the side effects from its clinical trials; Medtronic's failure to report that many of the authors who studied and promoted INFUSE Bone Graft had significant financial ties to Medtronic; and that off-label use of INFUSE Bone Graft can lead to severe side effects.

2.     Ms. Anderson underwent spinal surgery which was expected to cure and remedy the back pain she was experiencing as the result of a previous failed spinal surgery.  As a result of this surgery and the untested, unapproved and off-label use of materials during surgery, Ms. Anderson's condition and pain has worsened.  Defendant Medtronic illegally promoted an off-label use of their product and failed to deal honestly with the medical community and the public by its failure to warn the FDA and disclose to the FDA known adverse events from the use of INFUSE.  As a result of this conduct Ms. Anderson has endured serious physical and emotional pain, continues to receive medical care, and can no longer participate in many of the regular activities she once enjoyed.

## THE PARTIES

3.     Plaintiff **Marie Anderson** ("Ms. Anderson" or "Plaintiff") is a 48-year-old female who is, and at all times relevant hereto was, a resident of San Diego County, California.

4.     Plaintiff **Robert Anderson** ("Mr. Anderson" or "Plaintiff") is, and at all times relevant hereto was, a resident of San Diego County, California and married to Ms. Anderson.

///

5.     Defendant **Medtronic Sofamor Danek USA, Inc.**, and Does 1-10, inclusive, and each of them are and at all relevant times were, corporations doing business in California, including but not limited to manufacturing, marketing, promoting and selling medical products and devices for use on California citizens.  Medtronic Sofamor Danek USA, Inc. is, and at all relevant times was, a subsidiary of defendant Medtronic, Inc.

6.     Defendant **Medtronic USA, Inc.**, and Does 11-20, inclusive, and each of them are and at all relevant times were, corporations doing business in California, including but not limited to manufacturing, marketing, promoting and selling medical products and devices for use on California citizens.  Medtronic USA, Inc. is, and at all relevant times was, a subsidiary of Defendant Medtronic, Inc.

7.     Defendant **Medtronic, Inc.**, and Does 21-30, inclusive, and each of them are and at all relevant times were, corporations doing business in California, including but not limited to manufacturing, marketing, promoting and selling medical products and devices for use on California citizens.  Medtronic maintains research, development, manufacturing and/or distribution facilities in California.  Defendants Medtronic Somafor Danek USA, Inc., Medtronic USA, Inc., and Does 1-100, inclusively, will hereinafter be referred to as "Medtronic" or "Defendants."

8.     At all times relevant, Medtronic was engaged in the manufacture, promotion and sale of INFUSE Bone Graft.  INFUSE Bone Graft is a surgically implanted medical device containing a genetically engineered protein designed to stimulate bone growth.

9.     The true names and capacities, whether individual, corporation, associate, or otherwise, of the defendants named herein, under the fictitious names of **DOES 1 through 100**, inclusive, are unknown to Ms. Anderson, who, therefore sues said defendants by such fictitious names.  Ms. Anderson will ask leave of court to amend this complaint and insert the true names and capacities of said defendants when the same have been ascertained.  Ms. Anderson is informed and believes and based thereon

alleges that each of the defendants designated herein as a "Doe" is legally responsible in some manner for the events and happenings alleged herein, and that Ms.. Anderson's damages were proximately caused by such defendants.  Unless otherwise specified, references herein to "defendants" refer to the Medtronic Defendants and DOES 1 through 100 inclusive.

10.    At all times herein mentioned, Defendants, and each of them, and their aggregates, corporates, associates, and partners, and each of them, were the agent, servant, employee, assignee, permissive user, successor in interest or joint venture of each other, and were acting within the time, purpose or scope of such agency or employment or permission; and all acts or omissions alleged herein of each such defendant were authorized, adopted, approved, or ratified by each of the other defendants.

## JURISDICTION

11.    On March 18, 2014, Defendants removed this case to federal court. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiffs and the Defendants, and because Plaintiffs allege an amount in controversy in excess of $75,000, exclusive of interest and costs.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the wrongful acts upon which this lawsuit is based occurred in this District.

## ALLEGATIONS

## I.    FDA AND FDCA REGULATIONS APPLICABLE TO MEDICAL DEVICES

13.    At all times herein relevant, the United States Food and Drug Administration ("FDA") was, and is, the federal agency of the Unites States responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§301, *et seq.*, and ensuring, among other

things, that the medical devices intended for use in humans are safe and effective for each of their intended uses and that the labeling of such medical devices bears true and accurate information.

14.     At all times herein relevant, the FDCA stated that a "device" for use in humans includes "an…implant…or other similar or related article…which is…intended for use in…the treatment or prevention of disease of man…or intended to affect the structure or any function of the body of man…which does not achieve its primary intended purposes through chemical action within or on the body of a man and which is not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. §321(h).

15.     At all times herein relevant, the FDCA required every manufacturer of a new device to obtain approval from the FDA prior to marketing and selling its device in interstate commerce.

16.     To obtain such approval, the FDCA assigned all devices into one of three classes of devices, depending on the degree of regulatory control necessary to provide reasonable assurance of the safety and effectiveness of the device for its intended use. Class I devices pose the lowest risk to consumer's health, do not require FDA approval for marketing, and include devices such as tongue depressors.  Class II devices pose an intermediate risk and often include special controls including post-market surveillance and guidance documents.  Class III devices pose the greatest risk of death or complications and include most implantable surgical devices including several types of implantable orthopedic devices for spine and hip surgery.

17.     At all times herein relevant, the FDCA provided four different ways for a manufacturer to obtain approval to introduce the device for human use into interstate commerce:

        a)  *Premarket Approval.*  Before a company could market a Class III device, that company is required to submit a premarket approval ("PMA") application to the FDA that provides the FDA with a

reasonable assurance that the device is safe and effective for its intended use. 21 U.S.C.§§360e(a)(2) and 360e(d)(2). In order to show safety and effectiveness, the applicant is required to submit proof to the FDA, typically in the form of clinical trial results.

b) *510(k) Approval.* Alternately, a company could seek a premarket notification, commonly referred to as a "510(k)," to the FDA seeking a determination that the device was "substantially equivalent" to a legally marketed device. 21 U.S.C. §§360c(f) and (i) and 360(k). If the FDA "cleared" the device by determining that the device was substantially equivalent to a device that had already demonstrated safety and efficacy, the company could market the device, which was then considered to be in the same class as the device to which it was compared. 21 U.S.C. §360c(f)(1).

c) *Investigational Device Exemption.* This exemption allows for clinical investigation of devices to determine safety and effectiveness for new uses. 21 U.S.C.§360j(g) and 21 C.F.R. §812. Submission, and subsequent approval, of an Investigational Device Exemption ("IDE") permits a device that would otherwise be required to obtain premarket approval to be shipped in interstate commerce for the purpose of conducting clinical investigations.

d) *Humanitarian Device Exemption.* The fourth option to obtain approval was the submission of an application for a Humanitarian Device Exemption ("HDE"). An HDE application is not required to contain the results of scientifically valid clinical investigations demonstrating that the device was effective for its intended purpose. The application, however, has to contain sufficient

information for the FDA to determine that the device did not pose an unreasonable or significant risk of injury or illness from its use, taking into account the probable risks and benefits of currently available devices or alternate forms of treatments. Additionally, the applicant had to demonstrate that no comparable devices were available to treat or diagnose the disease or condition, and that they could not otherwise bring the device to market.  An HDE approval is accompanied by certain additional requirements:

    i.  An HDE can only be granted upon a finding by the FDA that the device was designed to treat or diagnose a disease or condition that affected fewer than 4,000 individuals in the United States.

    ii.  A device approved under an HDE cannot be sold for an amount that exceeded the costs of research and development, fabrication, and distribution of the device; thus, the holder of an HDE is not allowed to make a profit on the sales of an HDE device.

    iii.  An HDE device can only be used at a medical facility after an institutional review board ("IRB") at or on behalf of the medical facility approved the use of the device for the FDA approved indication.  The IRBs acted as a safeguard that the HDE devices were being used properly.

18.     The FDCA required that a submission for approval of a device include proposed labeling for the proposed intended uses of the device that includes, among other things, the conditions for therapeutic use.  A device manufacturer is not permitted to promote and market a new device until it has an approval, including for the proposed labeling.  Moreover, if approved, the device manufacturer is permitted to promote the

device only for the medical conditions of use specified in the approved labeling.  Uses not approved by the FDA are known as "unapproved" or "off-label" uses.

19.     Devices that are promoted for uses that have not been approved by the FDA are deemed to be misbranded under the FDCA.

## II.     THE MEDTRONIC INFUSE BONE GRAFT PRODUCT

20.     Plaintiff is informed and believes and based thereon alleges that surgeons have, for decades, employed spinal fusion – a surgical technique in which one or more of the vertebrae of the spine are united together ("fused") so that motion no longer occurs between them – to treat a number of conditions.  These conditions include but are not limited to treatment of fractured vertebrae, spinal deformities (spinal curves or slippages), back pain from instability, or abnormal or excessive movement between vertebrae.  Similar to the concept of welding, spinal fusion surgery joins vertebrae together to eliminate or reduce movement between vertebrae through the use of bone grafts.

21.     Plaintiff is informed and believes and based thereon alleges that, in a bone graft procedure, the graft – usually bone or bone-like material – is placed around the vertebrae during surgery.  Over the following months a physiological mechanism, similar to that which occurs when a fractured bone heals, causes the graft to join or "weld" the vertebrae together.  The goal of spinal fusion is to obtain a solid fusion of the vertebrae.

22.     Plaintiff is informed and believes and based thereon alleges that, for years, autologous bone graft has been considered the "gold standard" in spinal fusion surgery. In an autologous bone graft, or "autograft," the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest, and implants the bone graft in the site where the fusion is desired.  As the harvested bone exhibits all the properties necessary for bone growth – including osteogenic, osteoconductive and osteoinductive properties – successful fusions occur at significantly higher rates in autograft procedures.

23.     Plaintiff is informed and believes and based thereon alleges that, as an alternative to autograft, patients can undergo an allograft procedure in which bone is taken from the cadavers of deceased persons who have donated their bone to so called "bone banks."  Although healing and fusion is not as predictable as with the patient's own bone, an allograft eliminates the need for the harvest procedure required in an autograft.

24.     Plaintiff is informed and believes and based thereon alleges that studies revealing the ability for biologically manufactured protein to generate bone growth in laboratory animals represented a potential to provide a third surgical option to traditional bone graft procedures including autograft and allograft procedures.  If fusion could be accomplished through the use of biologically manufactured proteins, patients could forego the harvest surgery required in an autograft, but could still benefit from the superior fusion rates associated with autograft procedures.

25.     Plaintiff is informed and believes and based thereon alleges that Medtronic acquired the exclusive rights to recombinant human bone morphogenetic protein-2 ("rhBMP-2") for spinal applications via a company buyout in an attempt to seize on the potentially lucrative opportunity to develop an alternative spinal fusion procedure.

26.     Plaintiff is informed and believes and based thereon alleges that on January 12, 2001, Medtronic filed the INFUSE Bone Graft PMA and was granted expedited review status by the FDA.

27.     The INFUSE Bone Graft is a medical device comprised of liquid synthetic protein derived from Chinese hamster cells, rhBMP-2, and absorbable collagen sponges ("ACS") which act as a carrier for the protein.  The components are sold together, as shown below:

///
///
///
///

**A.    INFUSE Bone Graft Was Only Approved for A Very Specific Spinal Procedure – Anterior Lumbar Interbody Fusion Utilizing All Components**

28.    Plaintiff is informed and believes and based thereon alleges that on July 2, 2002, the FDA approved INFUSE Bone Graft, a medical device containing an absorbable collagen sponge treated with rhBMP-2, for certain limited uses and procedures.

29.    Plaintiff is informed and believes and based thereon alleges that the FDA's limited use approval of INFUSE Bone Graft was based on concerns about potential adverse events that already had been reported with the product at the time of approval. As a result, the FDA approved INFUSE Bone Graft for a small percentage of overall spinal fusion surgeries, with a device label specifying the limited surgical application to be used.

30.    Plaintiff is informed and believes and based thereon alleges that, as presented in Medtronic's original PMA and eventually approved by the FDA on July 2, 2002, the INFUSE Bone Graft product consisted of two components (1) the LT-CAGE® Lumbar Tapered Fusion Device Component ("LT-CAGE"), and (2) the INFUSE Bone Growth Component.

31.    The LT-CAGE is a thimble-sized hollow metal cylinder which keeps the two vertebrae in place and provides a frame that contains and directs the development of new bone growth.  The INFUSE Bone Graft Component includes (a) an absorbable collagen sponge that acts as a carrier and scaffold for the active ingredient in INFUSE

Bone Graft, and (b) rhBMP-2, the actual active ingredient that is reconstituted in sterile water and applied to the ACS. Although these two components are sold separately, the initial approval labeling for the product indicates that the INFUSE Bone Graft must be used with the LT-CAGE component.

32.     The LT-CAGE is shown below:



33.     Plaintiff is informed and believes and based thereon alleges that the labeling also directs the specific manner in which both components are to be used in a fusion procedure.

34.     Plaintiff is informed and believes and based thereon alleges that, according to the label sought by Medtronic in the PMA and subsequently approved by the FDA, INFUSE Bone Graft can only be used in an Anterior Lumbar Interbody Fusion ("ALIF") procedure involving a single-level fusion in the L4-S1 region of the lumbar spine. ALIF is performed by approaching the spine from the front through an incision in the abdomen and is primarily used to treat pain resulting from disc collapse.[1]

35.     Plaintiff is informed and believes and based thereon alleges that there are numerous other lumbar spine surgeries for which INFUSE had not been approved but for which it has been promoted and/or utilized. These other lumbar procedures included: (a) Posterior Lumbar Interbody Fusion ("PLIF"), a procedure that is used to

---

[1] While the product's label remains substantially the same as that approved by the FDA in 2002, the FDA has made minor amendments to the label through post-approval supplements. For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-S1 to L2-S1 and later granted approval for uses in certain oral maxillofacial surgeries.

treat nerve compression and back pain resulting from a number of causes.  It involves approaching the spine from the back.  PLIF, however, is a more sensitive surgical approach and procedure because the spinal canal and nerves are posterior to the vertebral body, and because a surgeon must manipulate the dural sac (the membranous sac that encases the spinal cord within the vertebral column) to perform this procedure; (b) Posterolateral Fusion which is similar to the PLIF procedure, but instead of removing the disc space and replacing it with a bone graft, the disc space remains intact and the bone graft is placed between the transverse processes in the back of the spine. This allows the bone to heal and stabilizes the spine by fusing the transverse process of one vertebra to the transverse process of the next vertebra; and (c) Transforaminal Lumbar Interbody Fusion ("TLIF"), which is also similar to PLIF.  TLIF is a technique utilized when an inter-body fusion is performed via a posterior approach.  TLIF allows the surgeon to perform a fusion from a posterior approach without disturbing the dural sac by approaching from a more lateral, or sideways, approach.

36.    Plaintiff is informed and believes and based thereon alleges that, not only was the application of INFUSE Bone Graft with the LT-CAGE in an ALIF single level fusion **the only** procedure and indication used in the pivotal study that formed the basis of Medtronic's PMA submission, but the use of rhBMP-2 in other applications revealed instances of adverse events.  In particular, a Medtronic-sponsored trial examining the application of rhBMP-2 using the PLIF procedure was halted in December 1999 when heterotopic bone growth – a bone growth that occurs in areas of the body where such growth is not desired – developed in a number of patients.  A doctor who participated in the study reported that one of the patients he treated required two extra surgeries to clear the excessive bone growth from the spinal canal.  The complications observed in the PLIF trial were particularly serious given the potential of neural impingement (or nerve pinching) from such bony overgrowth in that procedure, potentially triggering the very sort of pain that a fusion procedure attempts to eliminate; the very type of pain that Ms. Anderson continues to suffer.

37.     Plaintiff is informed and believes and based thereon alleges that complications such as those noted in the PLIF trial result from INFUSE Bone Graft's very mechanism of action.  In such cases, INFUSE Bone Graft can stimulate bone growth where new bone is not desired and can lead to excessive bone growth and swelling in the target area.  There is insufficient scientific evidence concerning the proper dosages of rhBMP-2 for use in different procedures or the expected responses to the protein in different biological environments.  Indeed, many adverse events associated with the use of INFUSE Bone Graft result from off-label use of the product by surgeons who do not fully understand the powerful nature of this protein, nor have defendants, or any of them, provided any clinical or other scientific evidence to support the usages recommended by Medtronic.

38.     Plaintiff is informed and believes and based thereon alleges that, at the FDA Advisory Committee panel hearing on January 10, 2002 concerning FDA approval of Medtronic's INFUSE Bone Graft, the panel members stressed concerns regarding potential off-label use of the product and asked Medtronic presenters repeated questions about how the Company would seek to guard against off-label applications of the product.

39.     Plaintiff is informed and believes and based thereon alleges that, at the conclusion of the hearing, the FDA Advisory Panel again reiterated concerns regarding the potential for off-label use.  They specifically admonished Medtronic to guard against the use of Infuse Bone Graft in procedures other than the specific ALIF procedure provided in the labeled application.

40.     Plaintiff is informed and believes and based thereon alleges that, even at the time of its FDA approval, Medtronic and its senior management, were well aware of the concern regarding off-label uses of INFUSE Bone Graft and the potential dangers posed by such uses.

41.     Plaintiff is informed and believes and based thereon alleges that subsequent medical studies confirmed the fears of the FDA Advisory Panel that the use of INFUSE

Bone Graft outside of the studied application sought in the PMA could present severe risks to patient safety.  Medtronic knew through the adverse outcomes reported in medical journals and other sources, of the dangers posed by the increasing off-label use of INFUSE Bone Graft.  Medtronic, however, concealed these dangers because of their impact on the sustainability of the valuable revenue stream generated by the off-label sales of the product.

42.    Plaintiff is informed and believes and based thereon alleges that numerous medical studies published since the introduction of INFUSE Bone Graft have shown that its use in procedures not approved by the FDA can lead to serious, even adverse events.  A May 15, 2006 medical article in *Spine* entitled "controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue" observed that these complications often result from the product's mechanism of action.  As the authors stated "rhBMP-2 may stimulate bone growth in areas in which bone is not desired, especially as the material 'leaks' into such spaces…Although this phenomenon has not been thoroughly studied, it implies that the release of rhBMP-2 into the soft tissues stimulates a rapid, potentially life threatening, inflammatory reaction." Plaintiff is informed and believes and based thereon alleges that a number of other published articles and other studies likewise noted the serious risks posed by off-label use of INFUSE Bone Graft in more detail prior to its use in Ms. Anderson's surgeries.

**B.    Medtronic Failed to Warn and Report Adverse Events As Required by Its FDA Approval Thereby Concealing the Dangers of INFUSE**

43.    Plaintiff is informed and believes and based thereon alleges that Medtronic provided millions of dollars in undisclosed payments to doctors (including so-called "opinion leaders") who published articles in medical journals, delivered presentations at continuing medical education courses, and appeared at consulting engagements addressing off-label applications of INFUSE Bone Graft.  In turn, Medtronic's sales

1  force would direct other doctors to these consultants and Key Opinion Leaders or their

2  written work to further drive sales of INFUSE Bone Graft.

3       44.    Plaintiff is informed and believes and based thereon alleges that despite the

4  prohibition against off-label promotion, Medtronic actively promoted off-label use of

5  INFUSE Bone Graft by, among other things, providing doctors with information about

6  other doctors using the product off-label (including those "Key Opinion Leaders"

7  targeted by Medtronic as consultants) and by having Medtronic sales force personnel in

8  hospital operating rooms at the time of the off-label surgeries to provide doctors with

9  information and instruction during the actual surgeries.

10       45.    In addition to actively promoting INFUSE, Plaintiff is informed and

11  believes and based thereon alleges that despite the FDA's requirements to report all

12  adverse events and continue to monitor side-effects and negative results of using

13  INFUSE, Defendants failed to fully report the adverse events they knew, or should have

14  known, about.  As a result, the medical community was unaware of the dangers of using

15  INFUSE and the dangers of using it in an off-label manner as was being advertise and

16  promoted by Defendants.

17       46.    Even after premarket approval issues, manufacturers are required to report

18  to the FDA "no later than 30 calendar days after the day: the manufacturer receive[s] or

19  otherwise become[s] aware of information, from any source, that reasonably suggests

20  that a device" marketed by the manufacturer: (a) May have caused or contributed to

21  death or serious injury; or, (b) Has malfunctioned and this device or a similar device

22  [likewise marketed by the manufacturer] would be likely to cause or contribute to a

23  death or serious injury, if the malfunction were to recur.  21 C.F.R. § 803.50(a).  The

24  FDA also imposes a continued duty for manufacturers, such as Defendnats, to continue

25  to report all adverse events.

26       47.    Further, FDA regulations prohibit a manufacturer from "express[ing]" an

27  "intent" or merely "know[ing]" or having "notice" that its product "is to be used" "off-

28  label".  See 21 U.S.C. § 352(r)(2).  Thus, a manufacturer that knows a device is being

used for "off-label" uses is required to notify the FDA and obtain approval for labeling modifications consistent with the alternate use.  Failure to do so renders the device adulterated and misbranded.

48.     The medical community is finally beginning to learn of the serious risks associated with INFUSE Bone Graft.  In July 2011, one of the leading journals on spine surgery, *The Spine Journal*, dedicated its entire journal to publishing various articles regarding the risks associated with INFUSE Bone Graft.  The journal included articles on Medtronic's failure to report the side effects from its clinical trials; Medtronic's failure to report that many of the authors who studied and promoted INFUSE Bone Graft had financial ties to Medtronic within the median range of $12 to $16 million per study; INFUSE Bone Graft can lead to severe side effects; and that Medtronic and its paid consultants/study authors downplayed the risks associated with INFUSE Bone Graft, over emphasized its benefits and over-emphasized the risks associates with other conventional procedures.

## III.    PLAINTIFF MARIE ANDERSON'S SURGERY

49.     Ms. Anderson's surgeon, Dr. Ramin Raiszadeh, diagnosed her with "(1) [g]rade 3 spondylolisthesis L5-S1; (2) Severe bilateral L5 foraminal stenosis; (3) Degenerative disc disease L4-L5; and (4) [c]hronic intractable low back pain and right lower extremity pain."  On February 18, 2008, Dr. Raiszadeh performed procedures using INFUSE Bone Graft.

50.     On February 18, 2008, Dr. Raiszadeh performed a "[p]osterior lumbar interbody fusion L5-S1 using local auto body bone graft, as well as the INFUSE" and "[p]osterior lumbar interbody fusion L4-L5 using local autograft bone, as well as INFUSE" on Ms. Anderson.

51.     The procedure performed on Ms. Anderson during spinal fusion surgery was achieved via a posterior approach.

52.     Dr. Raiszadeh used the INFUSE Bone Graft in an off-label manner.  Instead of performing an *anterior* procedure, he opted for a *posterior* procedure.  The

FDA had not approved the Medtronic INFUSE Bone Graft to be used in posterior procedures.

53.     Plaintiff is informed and believes and based thereon alleges that Medtronic, through its sales representatives and paid Key Opinion Leaders directly and indirectly promoted, trained and encouraged Dr. Raisazdeh to use the INFUSE Bone Graft in an off label manner, including utilizing it in posterior procedures.

54.     Prior to her surgery, Plaintiff saw Medtronic's sales representatives frequently talking with Dr. Raisazdeh.  Plaintiff met one of Medtronic's sales representatives during an office visit with Dr. Raiszadeh, with whom Dr. Raiszadeh was discussing Plaintiff's upcoming surgery.  Plaintiff is informed and believes and based thereon alleges that Medtronic's sales representatives were actively persuading Dr. Raiszadeh to use INFUSE and to use it in an off-label manner. Given Defendants failure to disclose and their active concealment of the true adverse events and data relating to adverse events and negative side-effects of using INFUSE, Dr. Raiszadeh did not have information that would have been helpful to him in deciding whether to use INFUSE on Plaintiff.

55.     Plaintiff would not have consented to be treated with INFUSE Bone Graft had Plaintiff known of or been fully and adequately informed by the Medtronic Defendants of the true increased risks and serious dangers of using these devices together, which created a new device, untested by adequate clinical trials and experimental and thus, unreasonably dangerous.

56.     Plaintiff and Plaintiff's physicians reasonably relied on Medtronic's representations and omissions regarding the safety and efficacy of Medtronic's medical devices in Plaintiff's spine surgeries.

57.     Plaintiff did not know of the specific increased risks and serious dangers, and/or were misled by the Medtronic Defendants, who knew or should have known of the true risks and dangers, but consciously chose not to inform Plaintiff or Plaintiff's spine surgeon of those risks and to actively misrepresent those risks and dangers to the

Plaintiff and Plaintiff's physician. Plaintiff is informed and believes and based thereon alleges that her physicians did not know of the specific increased risk and serious dangers of the INFUSE product because Medtronic did not disclose the adverse events or negative side-effects to the FDA to allow doctors to find such information.

58.   Dr. Raiszadeh never informed Ms. Anderson that he would be using the Medtronic INFUSE Bone Graft.  It was not until 2013 that Ms. Anderson was told what was implanted and she was still never told, despite her request for information, about what type of bone (whether cadaver or synthetic) was used in her surgery.   Neither Medtronic nor Dr. Raiszadeh ever informed her that this product had only received limited FDA approval for certain procedures; he never informed her that he would be using the INFUSE Bone Graft in a posterior procedure that had never been tested or approved by the FDA; never informed her that an INFUSE Bone Graft clinical trial utilizing the posterior procedures had been halted due to the serious adverse events that had been experienced; never informed her that the use of INFUSE Bone Graft could result in unwanted bone growth and migration of the bone to sensitive nerve areas exacerbating her pain; never informed her of available alternative methods of surgery, and having failed to inform her of these facts and risks, Dr. Raiszadeh never actually obtained Ms.. Anderson's informed consent to perform the procedures he performed.

a. **Delayed Discovery**

59.   Defendants, through their affirmative misrepresentations and omissions, actively concealed from Ms. Anderson and any non-defendant healthcare providers the true and significant risks associated with INFUSE by failing to disclose to the FDA all known adverse events or the serious and pervasive injuries resulting from its INFUSE device and/or the off-label use of its INFUSE device.

60.   Medtronic's failure to document or follow up on the known defects of its products, and concealment of known defects, serious increased risks, dangers, and complications, constitutes fraudulent concealment that equitably tolls any proffered statute of limitation that may otherwise bar the recovery sought by Plaintiff herein.

61.     As a result of Defendants' actions, Ms. Anderson and the non-defendant healthcare providers involved in her surgeries were unaware, and could not have reasonably known or have learned through reasonable diligence, that Ms. Anderson's back pain and various symptoms were the result of these acts, omissions, and misrepresentations.

62.     Ms. Anderson continued to seek treatment for her back pain and in 2010 began receiving injections into her back to help alleviate the pain.  Even at that time, Ms. Anderson was never informed that her back pain could be a result of the INFUSE device or that her continued pain might be related to her 2008 surgery.  As a diligent and reasonable patient, Ms. Anderson had no way of knowing or learning that her continued back pain may have been from the INFUSE device because she was never informed about the specifics of how the device was used or the synthetic bone protein which can cause bone spurs or bony overgrowth.   Given that Defendants failed to report all the known adverse events to the FDA, Plaintiff is informed and believes and based thereon alleges her doctors were not aware in 2010 that her continued pain may have resulted from the INFUSE device.

63.     Ms. Anderson first learned of the risks and problems associated with INFUSE and Medtronic's concealment within two years of filing this action.

64.     Accordingly, no limitations period ought to accrue until such time as Ms. Anderson knew or reasonably should have known of some causal connection between INFUSE and the harm she suffered as a result.  As such, Ms. Anderson hereby invokes the discovery rule based on the fact that she filed her Complaint well within the time Ms. Anderson knew or should have known the facts as alleged herein.

65.     Additionally, the accrual and running of any applicable statute of limitations has been tolled by reason of Medtronic's fraudulent concealment of the true facts relating to the adverse events which may have triggered Plaintiff's doctors knowledge or may have disclosed to Plaintiff or her doctors that her suffering was similarly caused by the INFUSE.  Since Defendants failed to disclose the adverse events

to the FDA, which could be published in readily available medical journals used by doctors, including Plaintiff's doctors, her doctors were unaware of the causal connection between other patients' adverse events or side-effects and Plaintiff's symptoms.

66.     Additionally, each Defendant is equitably estopped from asserting any limitations defense by virtue of its fraudulent concealment and other misconduct as described in this Complaint.

67.     At all relevant times, the Medtronic Defendants were under a continuing duty to disclose the true character, quality, and nature of the increased risks and dangers associated with INFUSE Bone Graft.

68.     Additionally, the limitations period is tolled under principles of equitable tolling.

## PLAINTIFF'S CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## NEGLIGENCE AGAINST MEDTRONIC

69.     Ms. Anderson repeats and alleges every allegation set forth above as if fully set forth herein.

70.     On February 18, 2008, Ms. Anderson underwent a spinal fusion surgery. Her surgeon, Dr. Raiszadeh, performed a *posterior* fusion using Medtronic INFUSE Bone Graft.  INFUSE Bone Graft had only received limited approval by the FDA and had not been approved for a *posterior* procedure.

71.     As part of its approval, the FDA required Defendants to report to the FDA all continued clinical trials and adverse events relating to the use of INFUSE.  Plaintiff is informed and believes and based thereon alleges Defendants knew or should have known of the significant adverse events relating to the use of INFUSE, but failed to make necessary disclosures to the FDA or the medical community.

72.     Plaintiff is informed and believes and based thereon alleges if Defendants had warned and made the required disclosures to the FDA and medical community, Plaintiff's doctor(s) would have been able to access and research the adverse events and

have additional information to make a decision about whether to use INFUSE in Plaintiff or in an off-label manner.

73.    Defendants owed Plaintiff and Plaintiff's physicians duties to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing best scientific knowledge.

74.    Defendants had a confidential and special relationship with Plaintiff due to (a) Defendants' vastly superior knowledge of the health and safety risks relating to INFUSE, and (b) Defendants' sole and/or superior knowledge of their dangerous and irresponsible practices and adverse events relating to INFUSE.

75.    As a result, Defendants had an affirmative duty to fully and adequately warn Plaintiff and Plaintiff's physicians of the true health and safety risks related to INFUSE.  Independent of any special relationship of confidence or trust, Defendants had a duty not to conceal the dangers of INFUSE to Plaintiff and Plaintiff's physicians.

76.    This duty also extended to Medtronic's legal obligation to report adverse events to the FDA and warn the FDA of adverse events and side effects.  These reports would have been available to Plaintiff's surgeon via the FDA's online database, and they would have been available to researchers publishing independent studies on the safety and efficacy of INFUSE.

77.    A proximate cause of Ms. Anderson's injuries and damage is the negligence and misrepresentation of Medtronic, through its agents, sales representatives, paid Key Opinion Leaders, servants and/or employees acting within the scope of their employment, negligently, carelessly and recklessly researching, manufacturing, selling, merchandising, labeling, analyzing, testing, distributing, and marketing INFUSE Bone Graft, and including other things:

    a) Negligently, carelessly and recklessly failing to disclose, inform or warn the FDA of adverse events or side-effects from the use the INFUSE Bone Graft;

b) Negligently, carelessly and recklessly failing to fully disclose to the FDA the results of the testing and other information in its possession regarding the possible adverse reactions associated the use of INFUSE Bone Graft, such that doctors and medical professionals were not aware of the adverse events and potential side-effects of using INFUSE;

c) Negligently, carelessly and recklessly failing to adequately warn the FDA of the dangers, contra-indications, and side effects from the use of INFUSE Bone Graft;

d) Negligently, carelessly and recklessly failing to disclose that usage of INFUSE Bone Graft in posterior procedures had not been approved by the FDA, as a reasonable prudent drug manufacturer would; and

e) Negligently, carelessly and recklessly failing to act as a reasonably prudent drug manufacturer.

78.    Before Ms. Anderson was implanted with INFUSE Bone Graft through a posterior procedure, Medtronic, based upon the state of information that existed at the time, knew or should have known that such a use could be dangerous and unsafe.  In fact, Medtronic knew of significant adverse events that it failed to report to the FDA. However, Medtronic failed to provide this information to the FDA, which would be made available to doctors, including Plaintiff's doctors.  Additionally, Medtronic knew or should have known that such a posterior procedure could result in migration, unwanted bone growth, inflammation, enhanced pain and other serious side effects.

79.    In addition, Medtronic directed its own sales representatives to promote unapproved uses of INFUSE, and many representatives went so far as to recommend dosages of this potent molecule in risky unapproved procedures, and guide surgeons through such uses of the product during surgery.

80.    Medtronic's sales representatives participated in surgeries by providing surgeons with step-by-step instructions on how to use INFUSE, even when the product should not have been used or a physician, such as Plaintiff's doctor, would not have

used it had her physician known of the true adverse reports or the adverse side effects from using INFUSE.

81.     Defendants and their agents knew or should have known and/or recklessly disregarded the materially incomplete, false, and misleading nature of the information that they caused to be disseminated to the public and to physicians, including Plaintiff and Plaintiff's physicians, which was exacerbated by Defendants failure to disclose true and correct data and information to the FDA, as required.

82.     As a direct and proximate result of the acts and conduct of Medtronic in failing to provide information it had in its possession to the FDA, the medical community, doctors and medical professionals were not aware of the side effects and adverse effects of using INFUSE.  As a direct and proximate result of the acts and conduct of Medtronic, Ms. Anderson has been injured in her health, strength and activity, and has suffered, continues to suffer and, on information and belief, will suffer indefinitely into the future, severe, lasting and debilitating physical and mental pain and suffering. Some of these injuries may be permanent, totaling damages in an amount in excess of the jurisdictional minimum of the Court.

83.     As a further direct and proximate result of the acts and conduct of the Medtronic Defendants, Ms. Anderson has lost earnings and earning capacity, and will continue to incur such losses for an indefinite period of time in the future, and some of which losses may be permanent, all in an amount in excess of the jurisdictional minimum of the Court.

84.     As a further direct and proximate result of the acts and conduct of Defendants, and each of them, Ms. Anderson has incurred medical, hospital and related expenses and, on information and belief, will continue to incur such expenses in the future, all in excess of the jurisdictional minimum of the Court.

///

///

///

**SECOND CAUSE OF ACTION**

**FOR FRAUD BY OMMISSION AGAINST MEDTRONIC**

85.     Plaintiffs repeat and allege every allegation set forth above as if fully set forth herein.

86.     Medtronic concealed adverse information and provided inaccurate or misleading information which was material to treating surgeons' treatment decisions, which misled surgeons and patients who were relying on those surgeons' professional judgment, including Ms. Anderson and her treating surgeon.  This misleading information, along with omissions of material facts related to INFUSE Bone Graft's safety and effectiveness, caused health care providers, patients, and the general public, including Ms. Anderson and her surgeon, to be misled about INFUSE Bone Graft's risks and benefits and deprived surgeons from making a proper risk/benefit assessment as to the use and off-label use of INFUSE Bone Graft.

87.     Through internal adverse event reports, Medtronic knew that off-label use of INFUSE Bone Graft was not effective and could lead to serious side effects, including but not limited to unwanted bone growth, inflammation, and other serious side effects.  Medtronic failed to take any measures whatsoever to alert the FDA, surgeons or the public regarding these risks and instead continued to promote the off-label use of INFUSE Bone Graft as safe and effective.

88.     Plaintiff is informed and believes and thereon alleges that, despite knowing of thousands of adverse events and adverse consequences from the use of INFUSE, Defendants failed to make required disclosures to the FDA.  Defendants failure to abide by the required duty to make affirmative reporting to the FDA, Defendants concealed information that a reasonably prudent physician or patient, such as Plaintiff, would need or want to review prior to making a decision to use INFUSE.

89.     Plaintiff is informed and believes and based thereon alleges that, when the above misrepresentations and omissions were made by Medtronic, it knew those representations and/or omissions to be false, or willfully and wantonly and recklessly

disregarded whether the representations and/or omissions were true.  These omissions were made by Medtronic with the intent of defrauding and deceiving the public and the medical community and with the intent of inducing surgeons and hospitals (including Dr. Raiszadeh and Sharp Memorial Hospital) to use and recommend the off-label use of INFUSE Bone Graft.

90.    In connection with their INFUSE products, Defendants fraudulently and intentionally misrepresented material and important health and safety product information to the FDA, Plaintiff and Plaintiff's physicians, all as alleged herein. Plaintiff and Plaintiff's physicians would not have decided to use INFUSE had they known of the safety risks related to INFUSE.

91.    Medtronic knew that Plaintiff and Plaintiff's physicians would regard the matters Defendants concealed and misrepresented to be important in determining the course of treatment for the Plaintiff, including Plaintiff and Plaintiff's physician's decision whether or not to use INFUSE in Plaintiff's lumbar spine fusion surgery.

92.    Medtronic intended to cause Plaintiff and Plaintiff's physicians to rely on their concealment of information and misrepresentations about the safety risks related to INFUSE to induce them to use INFUSE for Plaintiff's lumbar spine fusion surgery.

93.    Plaintiff and Plaintiff's physicians were justified in relying, and did rely, on Defendants' concealment of information and misrepresentations about the safety risks related to INFUSE in deciding to use INFUSE for Plaintiff's lumbar spine fusion surgery.

94.    Plaintiff is informed and believes and based thereon alleges that her doctor would not have used INFUSE had he been aware of the dangers and the numerous unreported adverse events.  Further, Plaintiff would not have consented to the surgery had Medtronic complied with its obligation and duty to warn the FDA and report all adverse events and consequences it knew about but did not report.

95.    Plaintiff is informed and believes and based thereon alleges that, at the time the aforesaid representations and/or omissions were made by Medtronic, Ms. Anderson

and her medical providers were unaware of the falsity of said representations to the FDA and/or omissions of adverse events and reasonably relied upon Medtronic's omissions believing INFUSE was safe and not harming others when, in fact, it was neither.

96.    Plaintiff is informed and believes and based thereon alleges that, in direct and indirect reliance upon said representations of the adverse events and the deliberate concealment of adverse events and failure to warn the FDA, Dr. Raiszadeh used INFUSE Bone Graft in Ms. Anderson's off-label posterior procedure.  Had Dr. Raiszadeh been made aware of the inefficacy and serious risks associated with such use, he would not have used it.

97.    Had Ms. Anderson known of the actual dangers of and inefficacy of the off-label use of INFUSE Bone Graft, she would not have consented to its use of it in her surgery.

98.    Plaintiff is informed and believes and based thereon alleges that Medtronic's motive in failing to advise the FDA and, by extension, the medical community of these risks and inefficacies was for financial gain and fear that, if it provided proper and adequate information, the INFUSE Bone Graft would lose sales and market share.

99.    Plaintiff is informed and believes and based thereon alleges that, at all times herein mentioned, the actions of Medtronic, its agents, servants, and/or employees was wanton, grossly negligent, and reckless and demonstrated a complete disregard and reckless indifference to the safety and welfare of Ms. Anderson in particular and to the public generally in that Medtronic did willfully and knowingly fail to report all known adverse events to the FDA with the specific knowledge that physicians would rely on the absence of such evidence in making decisions to use INFUSE.

100.   Plaintiff is informed and believes and based thereon alleges that, at all times herein, Medtronic's conduct was malicious, fraudulent and oppressive toward Ms. Anderson in particular and the public generally, and Medtronic conducted itself in a

willful, wanton, and reckless manner.  Despite its specific knowledge regarding risks as set forth above, Medtronic deliberately failed to report this information.

101.   In doing the things aforementioned, Medtronic is guilty of malice, oppression, and fraud, and Ms. Anderson is therefore entitled to recovery of exemplary or punitive damages in a sum according to proof at trial.

**THIRD CAUSE OF ACTION**

**LOSS OF CONSORTIUM BY PLAINTIFF ROBERT ANDERSON**

102.   Plaintiffs repeat and allege every allegation set forth above as if fully set forth herein.

103.   Plaintiffs Marie Anderson and Robert Anderson are, and at all times herein mentioned were, husband and wife.

104.   As alleged hereinabove, Defendants, and each of them, are liable for causing injury to Ms. Anderson.

105.   Prior to her injuries, Ms. Anderson was able to and did perform her duties as a spouse.  Subsequent to the injuries and as a proximate result thereof, Ms. Anderson has been unable to perform the necessary duties as a spouse in that she can no longer perform the work and services usually performed by her in the care, maintenance, and management of the family home to the same degree.  Additionally, the marital relationship between Mr. Anderson and Ms. Anderson has been impaired to the extent that Mr. Anderson has sustained a loss of love, affection, society, companionship, relations and solace.

106.   Ms. Anderson will be unable to perform such work, services, and duties in the future, and by reason thereof, Mr. Anderson has been deprived and will be deprived of the consortium of his wife, Ms. Anderson, including but not limited to the performance of his spouse's necessary duties, all to Mr. Anderson's damage.

**PRAYER**

**WHEREFORE,** Ms. Anderson and Mr. Anderson pray for judgment against defendants as follows:

1.    For general damages in a sum exceeding this Court's jurisdictional minimum;

2.    For specific damages according to proof;

3.    For economic and non-economic damages in a sum exceeding this Court's jurisdictional minimum;

4.    For punitive and exemplary damages according to proof;

5.    For prejudgment interest and post-judgment interest as allowed by law;

6.    For the costs of the suit herein incurred; and

7.    For such other further relief as this Court may deem just and proper.


DATED:  May 29, 2015                    **GOMEZ TRIAL ATTORNEYS**


                              By:      /s/ Deborah S. Dixon
                                       John P. Fiske, Esq.
                                       Deborah S. Dixon, Esq.
                                       Stephanie S. Poli, Esq.
                                       Attorneys for Plaintiffs